# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1897 | **DATE** | 6/22/2004 |
| **CASE TITLE** | Deborah Hamilton, et al vs. O'Connor Chevrolet, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT O'CONNOR CHEVROL ET, INC.'S MOTION FOR SUMMARY JUDGMENT.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JUN 23 2004 | |
| ✓ | Docketing to mail notices. | | date docketed | 50 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| TBK | courtroom deputy's initials | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

2004 JUN 22 AM 8: 55

Date/time received in
central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUN 2 3 2004

DEBORAH AND KWANZA HAMILTON, )
on behalf of themselves and all others )
similarly situated, )
                       )
          Plaintiffs, )      Case No. 02 C 1897
                       )
     v. )      Judge Mark Filip
                       )
O'CONNOR CHEVROLET, INC., )
                       )
          Defendant. )

MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART DEFENDANT
O'CONNOR CHEVROLET, INC.'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs Deborah and Kwanza Hamilton ("Plaintiffs" or "the Hamiltons") purchased an automobile from O'Connor Chevrolet, Inc. ("Defendant" or "O'Connor") and have brought suit regarding that transaction under various federal and state statutes. The Court's jurisdiction is premised on federal questions presented in Counts I, III, and VI of Plaintiffs' Second Amended Class Action Complaint ("Second Amended Complaint"), which are brought, respectively, under the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"), and the Federal Odometer Act, 49 U.S.C. § 32701 *et seq.* ("Odometer Act"). As discussed more fully below, Judge Lefkow previously dismissed Counts II and IV, which were also brought under TILA and the ECOA, respectively. Count V alleges a violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, but the parties do not dispute that the Magnuson-Moss claim cannot provide a jurisdictional basis here because of the relatively small amount of money at issue in Plaintiffs' case. Counts VII and VIII allege

50

violations of the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et seq.*

Defendant has filed a motion requesting that the Court grant summary judgment in Defendant's favor on Counts I, III, and VI, and that the Court decline to exercise supplemental jurisdiction over Counts V, VII, and VIII. For the reasons stated below, Defendant's motion is granted as to Counts I and VI, and is denied as to Counts III, V, VII, and VIII.

## RELEVANT FACTS

Kwanza Hamilton remembers shopping for financing for the purchase of an automobile at only one place prior to March 15, 2001, Rizza Chevrolet ("Rizza"). (D.E. 35, Ex. A, at 23-24.) Rizza denied Kwanza's credit application. (*Id.* at 23.) Kwanza's mother, Deborah Hamilton, agreed to co-sign a loan with him through Rizza, but Kwanza did not like the terms Rizza offered. (*Id.* at 24; D.E. 43 at 4-5.)

On March 15, 2001, Ms. Hamilton and Kwanza went to O'Connor to purchase a car. (D.E. 43 at 2.) Ms. Hamilton testified at her deposition that she and Kwanza were told by an O'Connor salesperson that the 1996 Chrysler LHS they were considering purchasing was "privately owned." (D.E. 35, Ex. C, at 13.) Ms. Hamilton further testified that she understood this to mean that the car had only one previous owner. (*Id.* at 16.)[1]

That same day, in relation to their purchase of the 1996 Chrysler LHS, Ms. Hamilton and

---

[1] Plaintiffs did not include in their Local Rule 56.1(b)(3)(B) statement the facts regarding their being told that the car was "privately owned" and Ms. Hamilton understanding this to mean that the car had only one previous owner. Consequently, these facts are not properly before the Court. *See* Local Rule 56.1(b)(3)(B) (requiring that the statement of the party opposing summary judgment include "any additional facts that require the denial of summary judgment."). The Court will nonetheless assume that these facts are true for purposes of Defendant's motion; however, as explained below in the discussion of Count VI, the Odometer Act claim, doing so does not affect the Court's decision.

Kwanza signed a retail installment contract with a financing rate of 12.75%. (D.E. 43 at 2; *see* D.E. 35, Ex. 1 to Ex. B, at 1.) Before the Hamiltons signed this contract, Ms. Hamilton said "maybe I should go some place else" to O'Connor representative Karen Zimmerman. (D.E. 35, Ex. C, at 30.) Ms. Zimmerman reportedly told Ms. Hamilton "[t]his is the best deal you're going to get here." (*Id.; see also id.* ("She [Ms. Zimmerman] said that was the best she could do.")).[2]

In support of Plaintiffs' opposition to Defendant's summary judgment motion, Ms. Hamilton submitted a written certification. (D.E. 43, Ex. 1.) In it, she states that she remembers signing a contract on March 15, 2001 with a financing rate of 11.75% and that she does not remember signing a contract with a 12.75% financing rate. (*Id.* at 3.) She further states that she must have signed two contracts on March 15, 2001 and that

> The reason I did not see that I had signed a second contract for 12.75% was that when I was given documents to sign by Karen Zimmerman, they were kept in a stack. I was instructed to sign at the bottom of each piece of paper where only the signature line was visible. I never had the opportunity to look at the 12.75% 'voided' document that I signed and which was produced to my lawyers. Karen Zimmerman stood over me while she held onto the paperwork and showed me where to sign. The paperwork I signed on March 15, 2001 was never handed to me until after I had signed it and in fact, the 12.75% contract was <u>never</u> handed to me. I never knew that I had been obligated to a 12.75% contract until O'Connor took my deposition."

---

[2] At times Plaintiffs appear to contend that Ms. Zimmerman stated that the rate discussed with Plaintiffs was the best rate that Plaintiffs could get *anywhere*. The only support that Plaintiffs offer for this suggestion (in addition to the testimony of Ms. Hamilton, who testified that Ms. Zimmerman said that "[t]his is the best deal you're going to get *here*" (D.E. 35, Ex. C, at 30 (emphasis added)), is Ms. Zimmerman's answers to a handful of hypothetical questions asked at her deposition about how she might answer certain customer inquiries. (See D.E. 44 (Pl. Resp.) at 9-10.) There is no indication from these hypothetical questions that Ms. Zimmerman ever represented to anyone that the rate Zimmerman was quoting was the best rate they could get *anywhere*—as opposed to at O'Connor, as Ms. Hamilton's testimony reflects. In addition, there is nothing in the quoted questions and answers that reflects that Ms. Zimmerman ever represented to Plaintiffs that O'Connor was quoting them the best rate they might be able to obtain *anywhere*. Ms. Hamilton's testimony appears to preclude any such understanding.

(*Id.*) (emphasis in original). Defendant contends that Ms. Hamilton's certification should be disregarded because it contradicts Plaintiffs' earlier disclosures. (D.E. 48 at 4-8, citing, *inter alia, Patterson v. Chicago Ass'n for Retarded Citizens*, 150 F.3d 719 (7th Cir. 1998)).

On March 15, 2001, GMAC sent O'Connor a fax stating that Ms. Hamilton and Kwanza were approved for financing at "Tier: B." (D.E. 43, Ex. 3, at 1.) On March 26, 2001, GMAC sent O'Connor a fax stating "Please send a check or new contract for the rate difference. B tier is 14.75%, Contract is 12.75. To buy down it is $845.40." (D.E. 43, Ex. 4, at 1.)

Sometime shortly after March 26, 2001 (roughly two weeks after March 15, 2001, and at least March 26, 2001), the Hamiltons returned to O'Connor and signed a retail installment contract with a financing rate of 15.75%. (D.E. 49 at 2-3.) This contract was dated March 15, 2001 even though it was executed approximately two weeks after that date. (*Id.*) Plaintiffs have not asserted that any O'Connor representative stood over them and held onto this retail installment contract or otherwise failed to give it to them in a form they could keep before they signed it.

O'Connor truthfully disclosed the mileage of the 1996 Chrysler to Plaintiffs on the "Application For Vehicle Title and Registration." (D.E. 43 at 7.) Plaintiffs do not challenge the accuracy of the odometer reading or contend that O'Connor tampered with the odometer in any way. (*Id.* at 7-8.) O'Connor apparently does not dispute that it did not show Plaintiffs the vehicle's title document. (D.E. 49 at 3 (statement by Defendant that "in deals such as the Hamiltons', where a vehicle is financed, the title is not given to the customer, it goes to the lien holder until the loan is paid.")) The title shows that the car had two prior owners. (D.E. 49 at 4.)

Deborah Hamilton testified that, at some point after she and Kwanza purchased the car,

4

she spoke to an O'Connor representative and was "complaining about the contract." (D.E. 35, Ex. C, at 85.) She told the representative, "I didn't want the car no more. We were tired of all the problems we were having with it. I told them I was not going to be paying Enterprise all this money for car rentals and paying a car note and pay insurance and then have a car sitting in the driveway and pay a car note. I said, that don't make sense." (*Id.* at 85-86.) She was told to speak to Sean Galvin, another O'Connor representative. (*Id.*) She told Mr. Galvin, "I want another car. . . I want a car worth $25,000," (*id.* at 86), which is what she claims O'Connor said was the value of the 1996 Chrysler LHS. (*Id.*)

Ms. Hamilton testified that Mr. Galvin said that O'Connor would need to look at the car. (D.E. 35, Ex. C, at 86.) Ms. Hamilton further testified that she asked "but how [are] you going to have somebody look at [it] when they say it could be weeks or months before the car can be looked at because the garage is so backed up[?]" (*Id.* at 86-87.) According to Ms. Hamilton, Mr. Galvin said "well, since you are black, you get the black book price." (*Id.* at 87.) Ms. Hamilton took this to mean that "they're trying to tell me that I'm black and I'm lower than low, right, lower than dirt." (*Id.* at 92.)

O'Connor denies that Mr. Galvin made the "black book" statement. According to O'Connor, "[t]he Official Used Car Market Guide 'Black Book' is a periodical publication which contains listings of wholesale auction prices for used automobiles and trucks in multiple states." (D.E. 48 at 9.) Mr. Galvin testified that the Black Book is one source he uses in assessing the value of used cars. (D.E. 43, Ex. 7, at 81; *see also* D.E. 48 at 9.)

Plaintiffs filed their first complaint in this action on March 14, 2002. They filed a second complaint on April 23, 2002. (D.E. 34 at 4.) As Judge Lefkow previously found, neither of

those complaints mentioned that Plaintiffs returned to O'Connor after March 15, 2001 to sign another contract or asserted a claim based on backdating of a contract. (*Id.* at 6.) The first time the Plaintiffs raised such a claim was in Count II of their Second Amended Complaint, which they filed on August 5, 2003. (*Id.* at 4, 6.) On December 11, 2003, Judge Lefkow, on Defendant's motion, dismissed Count II of Plaintiff's Second Amended Complaint (as well as Count IV, an ECOA claim) on statute of limitations grounds. (D.E. 34 at 6-7.)

## LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine factual issue, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## DISCUSSION

A.      Count I (TILA).

Defendant has moved for summary judgment on Count I, which Defendant understands to be brought under 15 U.S.C. § 1638(b)(1). Defendant asserts, among other arguments, that Plaintiffs suffered no actual damages as a result of a violation of § 1638(b)(1), and that TILA allows for the recovery of only actual damages for violations of that section. (D.E. 35 at 4-6.)

That section of TILA, § 1638(b)(1), as expressed in Regulation Z of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 226.17, governs the form and timing of disclosures in that it mandates that certain disclosures be made in a form the consumer can keep, before credit is extended. *See Spearman v. Tom Wood Pontiac-GMC, Inc.*, 312 F.3d 848, 849-50 (7th Cir. 2002). In Plaintiffs' response to Defendant's summary judgment motion ("Plaintiffs' Response"), Plaintiffs assert that "Count I of the Hamiltons' second amended complaint asserts two separate violations of the TILA. First, the Hamiltons allege that O'Connor Chevrolet violated 15 U.S.C. §1638(b)(1) by failing to provide Plaintiffs with the required disclosures, in a form they could keep, before credit was extended. Second, the Hamiltons allege that O'Connor violated 15 U.S.C. §1638(a)(4) by failing to accurately disclose the annual percentage rate." (D.E. 44 at 3) (footnotes omitted). The upshot of Plaintiffs' assertion that they have alleged in Count I not only a claim for a violation of the form and timing requirements of § 1638(b)(1), but also a claim for a violation of § 1638(a), which governs the content of disclosures, is that, in addition to contending that they can prove actual damages, Plaintiffs' assert that they are also entitled to statutory damages on their § 1638(a) claim. (D.E. 44 at 10.)

Defendant, on the other hand, maintains that Count I does not include a claim under § 1638(a) and that this claim was actually contained in Count II, which already was dismissed by Judge Lefkow. (D.E. 48 at 1-3.) Defendant, therefore, holds to its argument that summary judgment is warranted on Count I because Plaintiffs cannot prove actual damages resulting from a violation of § 1638(b)(1). As explained below, the Court finds that Defendant is entitled to summary judgment on Count I, based in part on Judge Lefkow's prior ruling in this case.

1.      The claim under § 1638(a)(4)

As described in Plaintiffs' Response, the basis of their claim in Count I under §

1638(a)(4) is that "O'Connor backdated the contract." (D.E. 44 at 7.) Plaintiffs explain more

specifically that "the 15.75% retail installment contract dated March 15, 2001 was not executed

on March 15, 2001. In fact, it was signed two weeks later. Therefore, the annual percentage rate

was not 15.75%. . . . This entitles the Hamiltons to an award of statutory damages." (*Id.* at 7-8.)

However, Count I of the Second Amended Complaint contains no reference to § 1638(a), (D.E.

26, ¶¶ 43-53), which mandates certain disclosures, including the annual percentage rate ("APR").

*See* 15 U.S.C. § 1638(a)(4). Further, the only mention in Count I of backdating or the accuracy

of the disclosed APR is the following sentence: "Additionally, as Defendant backdated the

second retail installment contract, the APR was not accurately disclosed, as set forth in Count II

below." (*Id.,* ¶ 53.) As reflected by this sentence, it is Count II (that is, the count dismissed by

Judge Lefkow) which was brought under § 1638(a) and was based on the theory that "[b]y

calculating the APR as of March 15, 2001, rather than from the date on which the second

contract was signed, O'Connor disclosed the incorrect APR to the Hamiltons, in violation of the

TILA." (*Id.,* ¶ 65; *see also id.,* ¶ 64.) Because Count I does not assert a claim under § 1638(a),

the damages provisions of TILA pertaining to that section are therefore not applicable to Count I.

Moreover, Judge Lefkow already dismissed Count II, which contained Plaintiffs' claim

for Defendant's alleged failure—as a result of the alleged backdating of a retail installment

contract—to accurately disclose the APR in violation of § 1638(a). Indeed, Judge Lefkow

specifically noted in her opinion that Count II of the Second Amended Complaint "raises for the

first time the allegation that O'Connor violated the TILA when it consummated second or third

8

retail installment contracts with its customers and then backdated those contracts," and Judge

Lefkow also ruled that claims based on these "new factual allegations" were time-barred. (D.E.

34 at 7; *see also id.* at 5-8.) Thus, because Plaintiffs' claim for violations of § 1638(a) has

already been dismissed, Plaintiffs cannot rely on the statutory damages available for violations of

that section but must instead meet the requirements for recovery under § 1638(b)(1).

        2.      The claim under § 1638(b)(1)

Plaintiffs do not dispute that, under Seventh Circuit precedent, *see Brown v. Payday*

*Check Advance, Inc.*, 202 F.3d 987, 991-92 (7th Cir. 2000), statutory damages are not available

under TILA for violations of § 1638(b)(1). (*See* D.E. 44 at 8.) For violations of § 1638(b)(1), a

consumer may recover only "any actual damage sustained by such person as a result of the

failure." 15 U.S.C. § 1640(a)(1); *accord Brown*, 202 F.3d at 990. As mentioned above, §

1638(b)(1), as expressed in Regulation Z of the Board of Governors of the Federal Reserve

System, 12 C.F.R. § 226.17, mandates that certain disclosures be made in a form the consumer

can keep, before credit is extended. *See Spearman v. Tom Wood Pontiac-GMC, Inc.*, 312 F.3d

848, 850 (7th Cir. 2002). In this regard, the Seventh Circuit has explained that "the creditor may

fulfill the timing requirements of TILA and Regulation Z by providing the consumer with a copy

of the contract containing the appropriate disclosures moments before the consumer signs the

contract." *Id.* at 851.

Putting aside Defendant's objection to Ms. Hamilton's certification and viewing the facts

in the light most favorable to Plaintiffs, insofar as Ms. Hamilton has stated in her certification

that Ms. Zimmerman held onto the contracts Ms Hamilton signed on March 15, 2001 until after

Ms. Hamilton signed them, Plaintiffs have raised an issue of fact as to whether O'Connor failed

to provide Plaintiffs with copies of the retail installment contracts signed on March 15, 2001 (which have APRs of 11.75% and 12.75%) in a form the Plaintiffs could keep before Plaintiffs signed those contracts. However, Plaintiffs have not asserted that any O'Connor representative held onto the 15.75% retail installment contract or otherwise failed to give it to them in a form Plaintiffs could keep before they signed it. Thus, as to Plaintiffs' alleged actual damages under § 1638(b)(1), the pertinent question is whether Plaintiffs have raised a genuine issue of material fact as to whether they were damaged as a result of O'Connor's failure to provide Plaintiffs copies of the 11.75% and 12.75% contracts in a form they could keep before Plaintiffs signed them on March 15, 2001.

To show actual damages, Plaintiffs must present evidence that they were "effectively prevented from obtaining better credit terms elsewhere." *Nevarez v. O'Connor Chevrolet, Inc.*, 303 F. Supp. 2d 927, 934 (N.D. Ill. 2004) (internal quotation omitted); *accord, e.g., Anderson v. Rizza Chevrolet, Inc.*, 9 F. Supp. 2d 908, 913 (N.D. Ill. 1998) (collecting cases and holding that plaintiff must show that "but for the misrepresentation better credit terms would have been secured"); *Balderos v. Illinois Vehicle Premium Finance Co.*, No. 96-8050, 1997 WL 627650 at *6 (N.D. Ill. Oct. 2, 1997) (collecting cases and stating, "[to prove actual damages in a TILA case, each class member would have to prove that but for the violation, he would have obtained credit on more favorable terms elsewhere."). Ms. Hamilton testified that, before she signed the contracts on March 15, 2001, she said "maybe I should go some place else" to Ms. Zimmerman, (D.E. 35 at Ex. C at 30), but Plaintiffs have presented no evidence that they would have obtained financing at a rate better than 11.75% or 12.75% elsewhere. Precedent teaches that such evidence is insufficient to avoid summary judgment. *See, e.g., Nevarez*, 303 F. Supp. 2d at 934

(to demonstrate actual damages, plaintiffs must show not only that "they would have sought a different warranty or lower price" but also that "they would have obtained another warranty or a lesser price"); *Anderson*, 9 F. Supp. 2d at 913 (same); *Balkers*, 1997 WL 627650 at *6 (similar); *Graham v. R.R., LLC*, 202 F. Supp. 2d 483, 488 (E.D. Va. 2002) ("Graham has not provided any evidence of actual damages. The only possible claim Graham has of actual damages is that he could have secured a lower rate of 8% but for signing RISC #2 with an 11.5% interest (or RISC #1 at 12%). But Graham provides no evidence that he could have acquired such a rate in January or February 2001.") (emphasis omitted).

Plaintiffs' contention that O'Connor's failure to provide the 11.75% and 12.75% contracts in a form Plaintiffs could keep before they signed them resulted in damage to Plaintiffs because by signing these contracts they became obligated to a rate of 15.75% (while GMAC approved them at 14.75%), (D.E. 44 at 4-5), is without merit. The foundation of this argument, that at the time Plaintiffs signed the 11.75% and 12.75% contracts on March 15, 2001, they became obligated on the 15.75% contract they signed two weeks later, has been rejected by the Seventh Circuit. *See Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 767 (7th Cir. 2000). In *Janikowski*, the plaintiff signed one contract with a 5.9% APR, was denied financing, and then signed another contract with an 11.9% APR the next day. *See id.* at 766-67. The plaintiff argued "that Lynch Ford violated TILA because, although Lynch Ford disclosed an APR of 5.9%, she was ultimately required to pay an APR of 11.9%." *Id.* at 767. In rejecting this argument, the Seventh Circuit explained that by signing the 5.9% contract, the plaintiff "was not legally obligated to purchase the Escort at any rate other than 5.9%." *Id.* The plaintiff did not become obligated on the 11.9% contract until she signed the contract containing that finance term. *Id.*

11

So too, the Hamiltons did not become obligated to the 15.75% financing arrangement by virtue of signing the 11.75% and 12.75% contracts on March 15, 2001.[3] Therefore, although O'Connor's alleged failure to provide the 11.75% and 12.75% contracts to Plaintiffs in a form they could keep before they signed them on March 15, 2001 may have resulted in Plaintiffs signing the 11.75% and 12.75% contracts, it did not cause Plaintiffs to be obligated on the 15.75% financing arrangement.[4] Thus, Plaintiffs' obligation on the 15.75% financing arrangement cannot serve as a basis for damages on Plaintiffs' claim in Count I. Because Plaintiffs have not presented evidence that they suffered actual damages from any alleged violation of § 1638(b)(1), Defendant's summary judgment motion is granted on Count I.

---

[3] Plaintiffs may be correct insofar as they are arguing that they became contractually bound when they signed the 11.75% and 12.75% contracts on March 15, 2001. (D.E. 44 at 4-5.) As explained above, however, Plaintiffs did not become obligated on the 15.75% arrangement until they signed the contract containing those terms two weeks after March 15, 2001. *See generally Spearman v. Tom Wood Pontiac-GMC, Inc.*, 312 F.3d 848, 851 (7th Cir. 2002) (teaching that TILA does not impose a generalized duty of a lender to explain a borrower's legal rights to him or her). The Court notes that Defendant's victory on Count I may be a pyrrhic one: Plaintiffs at least appear to believe that the sales in any event will give rise to liability under Illinois law. (See D.E. 44 at 4 & n.11 (discussing 815 ILCS 505/2C).) The Court need not resolve this issue at the present time, because liability under that statute is not raised by the motion *sub judice*, and because Defendant has not had an opportunity to be heard on the issue.

[4] Similar to the case in *Janikowski*, Defendant's retail installment contracts expressly stated that by agreeing to the contract, the consumer was only agreeing to buy the vehicle in question "under the agreements on the front and back of the contract" (D.E. 43, Ex. 5, at 1), including the various financing terms expressly set forth in a separate section of the GMAC form entitled "Federal Truth-in-Lending Disclosures." (*Id.*) In *Janikowski*, the contracts in question indicated that if financing could not be obtained within five days "according to the proposals in the retail installment contract," then either the seller or purchaser could cancel the contract. *Id.*, 210 F.3d at 766. *Janikowski* also rejected the claim that the defendant failed to disclose that the quoted financing terms were merely estimates, *id.*; *Janikowski* instead found that the quoted lower rate "*was* the contractual rate, albeit a condition to the parties' duty to perform." *Id.* at 768 (emphasis in original).

B.    Count III (ECOA).

The ECOA provides, in pertinent part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race . . . ." 15 U.S.C. § 1691(a). Defendant argues that the alleged statement by Mr. Galvin, its representative, to Ms. Hamilton, that "well, since you are black, you get the black book price," (D.E. 35, Ex. C, at 87), cannot form the basis of a violation of the ECOA because the undisputed facts show that the statement was not discriminatory and that it was not made during a credit transaction. The Court disagrees.

According to Defendant, because it is undisputed that the Black Book is "a periodical publication which contains listings of wholesale auction prices for used automobiles and trucks in multiple states" and "Sean Galvin testified that he would use the 'Black Book' as one source in assessing the value of used cars . . . . the undisputed facts in the record make clear that the phrase 'Black Book' is not a racially derogatory term . . . ." (D.E. 48 at 8-9.) To be sure, the term "Black Book" may not be racially derogatory in every instance or every context in which it is used. However, a reasonable inference that can be drawn from the statement "since you are black, you get the black book price" is that Plaintiffs would be given the wholesale auction price, rather than a higher one, because of their race. If that is actually the case, then Plaintiffs were discriminated against on the basis of their race. In fact, Defendant appears to acknowledge that the "Black Book" statement can reasonably be interpreted in this fashion inasmuch as Defendant "vigorously contests" making the statement and describes it as "reprehensible and outrageous." (D.E. 48 at 10.)

Given that the issue of whether Defendant discriminated against Plaintiffs is a disputed

13

factual question, the next matter for the Court to address is whether, as Defendant contends, the undisputed facts establish that any such discrimination did not occur during a "credit transaction" as that term is defined for purposes of the ECOA. Defendant argues that the record demonstrates that any such discrimination did not occur during a credit transaction because the "Black Book" statement was made "weeks after the retail installment contract was signed and the underlying loan was assigned to GMAC as lienholder." (D.E. 48 at 10.)

The parties have not cited any cases they believe are analogous, and the Court has not found any that are particularly helpful either. Nonetheless, the term "Credit transaction" in the ECOA has been defined broadly by the Board of Governors of the Federal Reserve System to include events that occur after credit is extended:

> Credit transaction means every aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information; revocation, *alteration*, or *termination of credit*; and collection procedures).

12 C.F.R. § 202.2(m) (emphases added).[5]  Furthermore, while it is not clear exactly what outcome Ms. Hamilton intended to initiate when she spoke to O'Connor "complaining about the contract," (D.E. 35, Ex. C, at 85), it appears that she may have been seeking to alter or terminate her credit arrangement. More specifically, because she told O'Connor "I didn't want the car no more" and that it didn't "make sense" for her to continue paying the car note given all the problems with the car, (*id.* at 85-86), a reasonable inference that can be drawn is that one option Ms. Hamilton was pursuing was to trade-in the car in exchange for forgiveness on her loan,

---

[5] Defendant has not disputed that it is "creditor" and that each plaintiff is an "applicant" for purposes of the ECOA. (D.E. 48 at 8-11; D.E. 35 at 6-8.)

which would result in either an alteration or possibly a termination of her credit. *See generally Thele v. Sunrise Chevrolet*, No. 03-2626, 2004 WL 1194751 at *5 (N.D. Ill. May 28, 2004) ("[plaintiff] returned the Envoy as consideration for forgiveness–which she received–of the final five or six months of payments left on her Envoy.") Whether Defendant, in the same way it helped arrange financing for Plaintiffs with GMAC, could also arrange for forgiveness to be granted Plaintiffs in exchange for the trade-in (or effect some other alteration of the business arrangement) is also a factual question not resolved by the current record. In sum, because a creditor's dealings with an applicant regarding alteration or termination of credit are within the definition of "Credit transaction," and because there is factual ambiguity concerning whether, *inter alia*, Ms. Hamilton was seeking to alter or terminate her credit arrangement when she was allegedly told by Defendant "since you are black, you get the black book price," Defendant's motion for summary judgment as to Count III is denied.

    C.      Count VI (Odometer Act).

    The Odometer Act[6] requires car dealers to disclose to purchasers "the cumulative mileage registered by the odometer" in the manner prescribed by regulations issued by the Secretary of Transportation. 49 U.S.C. 32705(a). The applicable regulations provide that, with certain

---

    [6]Plaintiffs incorrectly describe the statute they are seeking relief under in Count VI as the "Motor Vehicle and Information Cost Savings Act." (D.E. 44 at 12.) The "Motor Vehicle Information and Cost Savings Act," which was codified at 15 U.S.C. §§ 1981-1991, was repealed by Pub. L. No. 103-272, § 7(b), 108 Stat. 1379 (1994). Its successor, the statute at issue in Count VI, 49 U.S.C. § 32701 *et seq.*, is located in Chapter 32 of Title 49 of the United States Code, which is titled "Odometers." Accordingly, this statute is properly referred to as the "Odometer Act." *Szwebel v. Pap's Auto Sales, Inc.*, No. 02-7797, 2003 WL 21750841 at *2 (N.D. Ill. July 29, 2003) ("Presuming that the Szwebels intended to assert a claim under the Federal Odometer Act, 49 U.S.C. § 32701 *et seq.*, rather than the repealed Motor Vehicle Information and Cost Saving Act, 15 U.S.C. § 1981 *et seq.* . . . .").

15

exceptions, car dealers must disclose the odometer reading on the vehicle's certificate of title. *See* 49 C.F.R. § 580.5(c). Civil liability attaches under the Odometer Act only where the plaintiff can prove both that the defendant violated the Act and also that the violation was done "with intent to defraud." 49 U.S.C. § 32710(a). Defendant contends that, even assuming that it did not comply with the Act because it accurately disclosed the vehicle's mileage on the Application for Vehicle Title and Registration rather than on the title itself, Plaintiffs still cannot establish liability. Defendants, citing considerable case law in support, contend that Plaintiffs cannot prevail on their Odometer Act claim, in that Plaintiffs cannot prove the requisite intent to defraud because Plaintiffs admittedly are not challenging the accuracy of the disclosed odometer reading or asserting that O'Connor tampered with the odometer in any way. In response, Plaintiffs argue that they are not required to show an intent to defraud with respect to the vehicle's mileage and that they have done enough by presenting evidence that Defendant allegedly represented that the car had one owner[7] while the title shows that the car perhaps had at least two owners. Joining with the majority of courts that have considered the issue, the Court holds that Defendant is entitled to summary judgment on the Odometer Act claim because Plaintiffs have presented no evidence that Defendant intended to defraud them with respect to the car's mileage or its odometer reading.

Congress has stated that the Odometer Act has two purposes: "(1) to prohibit tampering with motor vehicle odometers; and (2) to provide safeguards to protect purchasers in the sale of motor vehicles with altered or reset odometers." 49 U.S.C. § 32701; *accord Compton v. Altavista*

---

[7] For purposes of this motion, the Court will assume that Defendant represented that the car had one owner by stating that it was "privately owned." (D.E. 35, Ex. C, at 13.)

*Motors, Inc.*, 121 F. Supp. 2d 932, 942 (W.D. Va. 2000); *Edlund v. Ridgedale Automotive, Inc.*,

No. CIV. 001478ADMAJB, 2001 WL 877577 at *3 (D. Minn. Aug. 1, 2001). In keeping with

the express purposes of the Act (and its predecessor), a line of cases dating back more than

twenty-five years holds that civil liability under the Odometer Act is limited to mileage fraud and

odometer tampering. *See Ransom v. Rohr-Gurnee Volkswagen, Inc.*, No. 01-2137, 2001 WL

141297 at *2 (N.D. Ill. Oct. 15, 2001) (Zagel, J.) ("[Plaintiff] cannot maintain an action under the

Odometer Act where she makes no allegation of odometer tampering."); *accord Locascio v.*

*Imports Unlimited, Inc.*, 309 F. Supp. 2d 267, 270-71 (D. Conn. 2004); *Mayberry v. Ememessay,*

*Inc.*, 201 F. Supp. 2d 687, 695-96 (W.D. Va. 2002); *Edlund*, 2001 WL 877577 at **3-4;

*Compton*, 121 F. Supp. 2d 932, 941-42; *Michael v. Ferris Auto Sales*, 650 F. Supp. 975, 977 (D.

Del. 1987); *Purser v. Bill Campbell Porsche Audi, Inc.*, 431 F. Supp. 1235, 1237 (N.D. Fla.

1977). As explained by several of these courts, "[a] contrary holding would ascribe to Congress

the unlikely, and unsupported, intent of allowing the Odometer Act to serve as a vehicle for

plaintiffs to bring numerous state-law claims into federal court, simply because the claims

concern defects in an automobile's certificate of title." *Locascio*, 309 F. Supp. 2d at 270-71;

*accord Mayberry*, 201 F. Supp. 2d at 695-96 ("To hold otherwise would expand the meaning of

the Federal Odometer Act so that almost any state-law claim for fraud [implicating a car sale]

would also be a violation of federal law. Even the idea that there can be a 'non-mileage

violation' of an act whose central purpose is to ensure the accurate reporting of mileage strains

credulity."); *Compton*, 121 F.Supp.2d at 941 & n.4 (holding that "[t]o interpret the 'intent to

defraud' provision as . . . [plaintiff] does could lead to the federalization of a 'large segment of

common law fraud,' which is certainly not consistent with the stated purposes of the Odometer

Act.") (quoting *Michael*, 650 F. Supp. at 977).

In this vein, numerous cases have rejected attempts to use the Odometer Act as a more generalized car-sale-fraud statute in instances where the allegations did not reflect any intent to defraud concerning the car's mileage or any allegation of odometer tampering. *See, e.g., Locascio*, 309 F. Supp. 2d at 270-71 (rejecting claim concerning whether car had been salvaged and whether such information was reflected on car title, where mileage was accurately disclosed); *Compton*, 121 F. Supp. 2d at 941-42 & n.4 (rejecting claim concerning alleged fraud concerning time when ownership of vehicle actually was transferred via title and other transaction documentation); *Edmund*, 2001 WL 877577 at *3 (rejecting claim concerning whether seller accurately disclosed car's accident history); *Michael*, 650 F. Supp. at 977 (rejecting claim concerning whether seller had disclosed that certain engine parts that tend to wear with mileage had been replaced with even older parts, and stating that a contrary interpretation would invite litigants to invoke a "federal treble damages remedy whenever a transferor fails to disclose that any one of the many vehicle components that tend to depreciate with mileage has been replaced with an older part").

In the only two decisions this Court has located which have held that a general intent to defraud (that is, an alleged intent to defraud unrelated to the car's mileage or any other allegation of odometer tampering) is sufficient under the Act—*Salmeron v. Highlands Ford Sales, Inc.*, 223 F. Supp. 2d 1238 (D. N. M. 2002), and *Yazzie v. Amigo Chevrolet, Inc.*, 189 F. Supp. 2d 1245 (D. N. M. 2001)—the courts did not mention the above line of authority and do not appear to have considered it. In both *Salmeron* and *Yazzie*, the courts based their decision that the Odometer Act is intended to remedy more than mileage fraud on the fact that "'the Act's

regulations specifically require that a certificate of title signed by the transferor be the primary means of providing odometer information . . . .and supplying a purchaser or transferee of a motor vehicle with *any* kind of a written statement of an odometer's reading, regardless of its accuracy, does not constitute compliance.'" *Salmeron*, 223 F. Supp. 2d at 1243 (quoting *Yazzie*, 189 F. Supp. 2d at 1247-48) (emphasis in *Yazzie*).[8]

Consistent with the fact that Congress expressly identified the purposes of the Act to be the prohibition of odometer tampering and the provision of safeguards to protect purchasers from buying cars with altered or reset odometers, the Court sides with the weight of authority and finds that summary judgment is appropriate as to Count VI because the Plaintiffs have made no showing of intent to defraud concerning the car's mileage or any allegation whatsoever of odometer tampering. (Indeed, the Plaintiffs concede that the mileage was accurately disclosed, and they also expressly acknowledge that they do not allege odometer tampering (D.E. 43 at 7-8.)) *See Mayberry*, 201 F. Supp. 2d at 695 (while plaintiff might have "a claim for common-law fraud or other similar state claims," "Plaintiff cannot maintain a cause of action" under the Odometer Act "without evidence of intent to defraud as it relates to the purposes of the Act."); *accord, e.g., Locascio*, 309 F. Supp. 2d at 270 (requiring intent to defraud concerning purposes of the Odometer Act). Defendant's summary judgment motion is granted as to Count VI.

---

[8] These cases have been criticized and/or expressly rejected in some of the cases cited above. *See Locascio v. Imports Unlimited, Inc.*, 309 F. Supp. 2d 267, 270 (D.Conn. 2004) (rejecting *Salmeron* and *Yazzie* "general intent" approach); *Mayberry v. Ememessay, Inc.*, 201 F. Supp. 2d 687, 695 & n.1 (W.D. Va. 2002) (rejecting reasoning of *Yazzie*, and citing *Compton v. Altavista Motors, Inc.*, 121 F. Supp. 2d 932 (W.D. Va. 2000), in support).

D.    Counts V, VII, and VIII (Magnuson-Moss and State Law Counts).

Defendant's sole argument in support of dismissing Counts V, VII, and VIII is that because all of the counts that independently confer federal subject matter jurisdiction (that is, Counts I, III, and IV) should be dismissed pursuant to Fed. R. Civ. P. 56, the Court should decline to exercise jurisdiction over the supplemental claims (Counts V, VII, and VIII).[9] Because Count III (the ECOA claim) was not dismissed, Defendants' argument is inapplicable on its own terms.  Accordingly, the Court declines to dismiss Counts V, VII, and VIII.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Counts I and VI, and denied as to Counts III, V, VII, and VIII.

Mark Filip
United States District Judge
Northern District of Illinois

Enter: _6-22-04_

---

[9] As previously explained, the parties do not dispute that, on the facts of this case, Plaintiffs' Magnuson-Moss claim does not confer federal subject matter jurisdiction because of the relatively small amount of money at issue in Plaintiffs' case. *See generally Gardynski-Leschuck v. Ford Motor Company*, 142 F.3d 955, 959 (7th Cir. 1998).