IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEBORAH AND KWANZA HAMILTON,      )
                                  )      Case No. 02 C 1897
                  Plaintiffs,     )
                                  )      Judge Mark Filip
         v.                       )
                                  )
O'CONNOR CHEVROLET, INC.,         )
                                  )
                  Defendant.      )

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Deborah and Kwanza Hamilton ("Plaintiffs or "the Hamiltons"), purchased an

automobile from Defendant, O'Connor Chevrolet, Inc. ("Defendant" or "O'Connor"), and

brought suit regarding that transaction under various federal and state statutes. (D.E. 26 (the

operative complaint, also "Complaint").) Defendant previously filed a summary judgment

motion directed only to federal claims. After the Court denied in part and granted in part

Defendant's motion concerning those federal claims, the parties briefed the propriety of summary

judgment concerning state law claims and a Magnuson-Moss claim that the parties agreed could

not independently provide federal jurisdiction because of the relatively small amount of money at

issue in Plaintiffs' case. The instant summary judgment motion is therefore directed to: (1) an

alleged breach of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (Count V); (2) an

alleged violation of section 2C of the Illinois Consumer Fraud Act (Count VII); and (3) an

alleged violation of the Illinois Consumer Fraud Act based on putative misrepresentations and

omissions (Count VIII). (D.E. 58.) For the reasons stated below, the Motion is granted in part

and denied in part. It is denied with respect to Counts V and VII. It is granted in part and denied

in part as to Count VIII.

I.    Factual Background

    A.    Lack of Compliance with Local Rule 56.1

The relevant facts are taken from the proper portions of the parties' filings under Local Rule 56.1 ("L.R. 56.1"). As is the practice in this district, the Court only considers those facts that are presented in conformity with L.R. 56.1. The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with L.R. 56.1. *See Bordelon v. Chicago Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *accord Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809 (7th Cir. 2005).

The Seventh Circuit and district courts have not been wedded to enforcement of the local rule as a matter of mere formalism. Rather, precedent acknowledges that it is a "reasonable judgment" that "consistent, 'bright-line' enforcement is essential"—not only in promoting compliance with the local rule, but also "to ensuring that [the] long-run aggregate benefits in efficiency" that LR 56.1 is intended to produce are realized for the system of justice in the Northern District of Illinois. *Kozola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (collecting cases); *accord, e.g., Midwest Imports v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995). In addition, the process established in LR 56.1 (and its predecessor, L.R. 12(M) and (N)), helps focus and narrow the factual disputes so the court is not attempting to guess at what fairly can be argued and inferred from an often massive factual record; that dynamic helps to ensure that the summary judgment process best promotes fair results for all.

The parties each included additional facts in their responses to each other's L.R. 56.1(a) statement of material facts. The Seventh Circuit has consistently affirmed that this practice is improper under the rule and that statements contained in responses that go beyond what is

2

necessary to justify a denial will not be considered. *See Cichon,* 401 F.3d at 809 (collecting cases); *Midwest Imports,* 71 F.3d at 1316-17; *see also Smith v. Lanz,* 321 F.3d 680, 683 (7th Cir. 2003); *Bordelon,* 223 F.3d at 528-29. Thus, the Court disregards the additional statements of fact contained in the following paragraphs: Plaintiffs' Response to O'Connor's LR 56.1 Statement of Material Facts ("D.E. 63") ¶¶ 7, 16, and 30; and Defendant's Response to Plaintiff's Statement of Additional Material Facts ("D.E. 64") ¶ 21.

Where a party has offered a legal conclusion, the Court will not consider the statement. *See, e.g., Malec v. Sanford,* 191 F.R.D. 581, 583-85 (N.D. Ill. 2000) ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."). Accordingly, the Court will disregard the legal argument in the following paragraph: D.E. 64 ¶ 5.

Additionally, the Court finds that certain of the Hamiltons' statements of fact overstate the evidence. The Court, therefore, has gone through the record and, where cited herein, has considered the actual evidence from the record. *Accord Malec,* 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities.")

    B.    Relevant Facts[1]

On March 15, 2001, the Hamiltons went to O'Connor to purchase a car. (D.E. 63 ¶ 5.) Ms. Hamilton testified at her deposition that she and Mr. Hamilton were told by an O'Connor salesperson that the 1996 Chrysler LHS (the "Chrysler") they were considering purchasing was

---

[1]    The Court's opinion of June 23, 2004, sets out the general background facts, and this opinion presumes familiarity with those facts as previously related. (D.E. 50.) Accordingly, in this opinion, the Court includes only facts necessary for the determination of the particular arguments raised by the parties with respect to the Motion.

3

"privately owned." (D.E. 59 ¶ 30 and Ex. A at 13.) Ms. Hamilton understood this to mean that the car had one previous owner. (*Id.* ¶ 31.) The salesperson told Deborah Hamilton that the Chrysler had been looked over by a mechanic. (*Id.* ¶ 32.) The Hamiltons claim that O'Connor told them that the Chrysler had a "Blue Book" value of $25,000, when the Kelley Blue Book actually valued the vehicle, assuming an excellent condition, at only $11,225. (D.E. 63 at 11, ¶ 20.)

           1.     The Retail Contract

That same day, in relation to their purchase of the Chrysler, the Hamiltons signed a retail installment contract (the "Retail Contract") with O'Connor listed as the "Seller." (D.E. 59 ¶¶ 6 and 8.) The back side of the retail installment contract contained the following bold-face language:

> **Warranties Seller Disclaims. You understand that the Seller is not offering any warranties and that there are no implied warranties of merchantability, of fitness for a particular purpose, or any other warranties, express or implied by the Seller, covering the vehicle unless the Seller extends a written warranty or service contract within 90 days from the date of this contract.**

(*Id.* at ¶ 7; D.E. 63, Ex. 11.) O'Connor also provided the Hamiltons with a "We Owe" slip, which allowed the Hamiltons to have the brakes checked and repaired by O'Connor at no charge for thirty days from the date of issuance. (D.E. 59 ¶ 13 and Ex. D.)

The Retail Contract, executed on March 15, 2001, reflects a financing rate of 12.75% for the approximately $13,600.00 loan for the purchase of the Chrysler. (D.E. 63, Ex. 11.)[2] As reported in the Retail Contract, the Hamiltons gave a down payment of $2,000 as consideration

---

      [2]      On March 15, 2001, General Motors Acceptance Corp. ("GMAC") had sent O'Connor a fax stating that the Hamiltons were approved for financing at "Tier B." (D.E. 63, Ex. 8.)

4

with respect to delivery of the Chrysler. (*Id.* ) Ms. Hamilton testified that when she left

O'Connor on March 15, 2001, taking possession of the Chrysler, she was "under the

understanding that this retail installment contract, the percentage rate, and everything else was

locked in." (D.E. 59, Ex A at 38.) Relying on the Affidavit of Spot Delivery signed by both Ms.

Hamilton and her son, Kwanza, on March 15, 2001, O'Connor disputes this fact, claiming that

the Hamiltons understood that financing with respect to the Chrysler was not locked in and was

subject to subsequent approvals. (D.E. 64 ¶ 17 and Ex. B).

On March 26, 2001, GMAC sent O'Connor a fax stating, "Please send a check or new

contract for the rate difference. B tier is 14.75%. Contract is 12.75. To buy down it is $845.00."

(D.E. 63, Ex. 8.) Sometime shortly after March 26, 2001 (roughly two weeks after March 15,

2001, and at least March 26, 2001), the Hamiltons returned to O'Connor and signed a new

Retail Contract with a revised financing rate of 15.75%. (*Compare* D.E. 63, Ex. 11 *with* D.E. 59,

Ex. B) (showing that initial Retail Contract had an interest rate of 12.75%, and that second Retail

Contract is the same in all material respects except for the new interest rate of 15.75%).)[3] The

Hamiltons claim that an employee at O'Connor told them that 15.75% was the best interest rate

available to them. (D.E. 63 at 12, ¶ 25.)

2.     The Service Contract

On March 15, 2001, the Hamiltons also entered into a service contract (the "Service

Contract") in relation to their purchase of the vehicle with a company named Lyndon American,

---

[3]     The second Retail Contract was dated March 15, 2001, even though it was
executed approximately two weeks after that date. (D.E. 59, Ex. B.) The finance charge on the
second contract increased from $4,870.88 to $6,048.38, and the sale price increased from
$20,496.20 to $21,456.20. (*Compare* D.E. 63, Ex. 11 *with* D.E. 59, Ex. B.)

Inc. ("Lyndon American"). (D.E. 59 ¶ 9 and Ex. C.) The parties dispute O'Connor's role with

respect to the Service Contract. (D.E. 63 ¶¶ 9-11 and D.E. 64 ¶¶ 1-5.)[4] For example, O'Connor

admits that it told the Hamiltons the price of the Service Contract. (D.E. 64 ¶ 1.) In response to

interrogatories, the Hamiltons assert that an employee at O'Connor "wrote up the service

contract." (D.E. 63, Ex. 3 at ¶ 3.[5]) Ms. Hamilton also testified as follows:

> Q: Was it your understanding when you left O'Connor Chevrolet on March 15,
> 2001, that the dealership was going to be responsible for making any repairs to the
> vehicle?
>
> A: Yes. Because we had purchased an extended warranty.[6] And as told by [an
> employee] of O'Connor Chevrolet, we were told if we had any problems under the
> warranty, they would repair and fix any and all problems. If we needed a car, we
> could get a loaner car. If they didn't have one available, we could get one from
> Enterprise, rent one from Enterprise, and we will be reimbursed for it.

---

[4]     A substantial portion of the evidence submitted by the parties with respect to this
dispute is not properly before the Court. *See* Local Rule 56.1(b). Not admitting this evidence,
however, does not affect the Court's decision. In this regard, the Court has reviewed the Service
Contract. Issues of contract interpretation are usually questions of law for the Court. *See, e.g.,*
*Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998); *Sheehy v. Sheehy*, 702
N.E.2d 200, 204 (Ill. Ct. App. 1998). That is why courts often say that "[t]he interpretation of a
contract is an issue particularly well-suited for resolution by summary judgment." *Baker v.
America's Mortgage Servicing, Inc.*, 58 F.3d 321, 326 (7th Cir. 1995) (citing *Metalex Corp. v.
Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th Cir. 1988)).

[5]     The Hamiltons also asserted in their summary judgment papers that O'Connor
"negotiated" the terms and price of the Service Contract (*see* D.E. 64 ¶ 4), but the Hamiltons
provided no appropriate evidentiary support for this assertion and it is accordingly ill-founded
under local rules concerning summary judgment adjudication.

[6]     After reviewing the record and briefs in this case, the Court finds that there is no
other document that the phrase "extended warranty" could be referencing other than the Service
Contract. (*Compare* D.E. 63, Ex. 4 *with* D.E 59, Ex. B (recap sheet with respect to the purchase
of the Chrysler listing the price of the "ext. warranty used" as $1295 and the Retail Contract
listing the price of the Service Contract as $1295).) To the extent that the Hamiltons would
contend that the reference applies to something else, the Court considers such a contention
waived for failure to present any explanation or argument to that effect.

(D.E. 59, Ex. A at 43.) O'Connor disputes that it agreed to repair and fix any problems with the vehicle, arguing that the deposition transcript demonstrates that Ms. Hamilton merely understood this to be the case and that the Service Contract shows otherwise. (D.E. 64 ¶ 3.) The parties agree, however, that O'Connor retained approximately $500 of the approximately $1,300 the Hamiltons paid for the Service Contract. (*Id.* ¶ 4.)

After the Hamiltons took possession of the Chrysler, they brought the vehicle to O'Connor for service on at least three separate occasions. (D.E. 63 at 5, ¶ 16.) Every time the vehicle was brought in, O'Connor's service department took an odometer reading. (*Id.* at 6, ¶ 17.) According to O'Connor's Odometer Disclosure Statement which Ms. Hamilton signed, when the Hamiltons took possession of the vehicle on March 15, 2001, the vehicle's odometer read 67,689 miles. (D.E. 59, Ex. I) On March 20, 2001, the Hamiltons brought the Chrysler into O'Connor to check the brakes. (*Id.* ¶ 14.) The service invoice from that inspection states, "Inspect brakes, ok." (D.E. 59, Ex. F). The invoice was not submitted to Lyndon. (D.E. 64 ¶ 6.) On that date, the odometer read 68,204 miles—or some 515 miles higher than at the time of pick-up five days earlier. (D.E. 59 ¶ 20 and Ex. E and F.) The Hamiltons next brought the vehicle to O'Connor on March 27, 2001, to check a leak. (*Id.* ¶ 22.) On that date, the odometer read 68,809 miles—or some 1,120 miles higher than at the time of pick-up twelve days earlier. (*Id.* ¶ 23.) The service invoice for checking the leak was not submitted to Lyndon. (D.E. 64 ¶ 7.) The car was next brought into O'Connor on May 22, 2001; on that date, the odometer read 75,533 miles—or some 5,844 miles higher than it did on the pick-up date some nine weeks earlier. (D.E. 59 ¶¶ 24-25.) Mr. Hamilton contends that there is no proof that the odometer is accurate; they also deny driving the vehicle to the extent reflected in the odometer readings.

The Hamiltons claim to have documented at least nine (9) separate communications with O'Connor regarding the condition of the Chrysler. (D.E. 63 at 10, ¶¶ 8-9.) O'Connor asserts that it is not aware of any of these "'documented' communications." (D.E. 64 ¶ 8 (quotations in original).) The parties also dispute whether Ms. Hamilton told O'Connor that, if the Chrysler was driven more than 30 miles per hour or if the air conditioner were turned on, it would begin to shake badly. (*Id.* ¶ 10). In addition, the parties dispute whether O'Connor told the Hamiltons that the vehicle could not be serviced for months because the garage was backed up. (*Id.* ¶¶ 10-12.)

According to the Certification of Kwanza Hamilton, the Chrysler was the Hamiltons' only vehicle and Mr. Hamilton's principal means to get to and from work. (D.E. 63, Ex. 5 at ¶¶ 4 and 9). Mr. Hamilton stated that both of his jobs were located less than 25 miles from home and the vehicle was used primarily to drive to and from work. (*Id.* at ¶¶ 3-4.) He also stated that he stopped driving the Chrysler after he spoke with O'Connor about the shaking problem and a damaged tire rod was replaced on May 22, 2001. (*Id.* at ¶¶ 8-9).

According to O'Connor, the business records of its service department (*i.e.*, odometer readings) show that the Hamiltons continued to drive the vehicle after May 22, 2001. (D.E. 64 ¶ 16 and D.E. 59 ¶¶ 18-27 and Ex. E-I.) O'Connor also relies on a letter from GMAC, dated October 1, 2001 (shortly after the vehicle was repossessed by GMAC), stating that the odometer reading on the vehicle was 78,222 miles. (D.E. 59, Ex. J.)

II.     Legal Standard

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the non-movant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "'[N]either presenting a scintilla of evidence, . . . nor the mere existence of some alleged factual dispute between the parties or some metaphysical doubt as to the material facts, is sufficient'" to forestall a motion for summary judgment. *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005) (quoting *Robin v. Expo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)). The non-movant "'must supply evidence sufficient to allow a jury to render a verdict in his [*i.e.*, the non-movant's] favor.'" *Van Diest*, 425 F.3d at 439 (quoting *Robin*, 200 F.3d at 1088).

III.    Discussion

   A.    Magnuson-Moss Claim for Breach of Implied Warranty of Merchantability
         (Count V)

The Magnuson-Moss Act authorizes actions by a consumer against a supplier for breach of implied warranties. *See* 15 U.S.C. § 2301(d)(1). An "implied warranty" is defined under the

9

Act as "an implied warranty arising under State law (as modified by section[] 2308 . . . of this title) in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301(7). Under Illinois law,[7] "[u]nless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 810 ILCS 5/2-314.

1.    The Disclaimer

The Hamiltons claim that O'Connor breached the warranty of merchantability implied by Illinois in violation of Magnuson-Moss with respect to the Chrysler. (D.E. 26 ¶¶ 96-98.) O'Connor seeks summary judgment in its favor as to this claim on the ground that it properly disclaimed the implied warranty of merchantability. Although most of the Hamiltons' arguments concerning Count V are not well taken, the Court finds that there is a triable issue with respect to at least one issue and accordingly refuses summary judgment on the Count.

Automobile dealers may waive the warranty of merchantability on a car sale. *See, e.g.*, *Long v. Wix Auto*, No. 00 C 5842, 2001 U.S. Dist. LEXIS 24135, *4 (N.D. Ill. Jan. 5, 2001) (Zagel, J.) (citation omitted). In this regard, the Uniform Commercial Code, which Illinois has adopted, provides that a seller may disclaim the implied warranty of merchantability so long as the language mentions "merchantability" and, in case of a writing, is "conspicuous." 810 ILCS 5/2-316.

---

[7]      The Court finds that Illinois law governs with respect to the Hamiltons' claims. The Hamiltons reside in Illinois, O'Connor is an Illinois corporation doing business in Illinois, and the Retail Contract and Service Contract were executed in Illinois. (D.E. 63 ¶¶ 1-2.) In addition, the parties in this case have based their briefs upon Illinois law. The case law of other jurisdictions is cited when no binding Illinois law exists or it illuminates general principles.

> A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color.

*Id.* Whether a disclaimer is conspicuous is a question of law for the court. *Id.*; *accord, e.g., Larry J. Soldinger, Assocs., Ltd. v. Aston Martin Lagonda of N. Am., Inc.,* 00 C 5842, 1998 WL 151817, *4 (N.D. Ill. March 26, 1998) (Kocoras, J.) (citing *Carpenter v. Mobile World, Inc.,* 551 N.E.2d 724, 728 (Ill. App. Ct. 1990)).

In the case *sub judice,* the disclaimer mentioned "merchantability" in writing that is conspicuous. The disclaimer specifically states, in bold: **"Warranties Seller Disclaims. You understand that the Seller is not offering any warranties and that there are no implied warranties of merchantability, or fitness for a particular purpose, or any other warranties, express or implied by the Seller . . . ."** (D.E. 59, Ex. B.) The bold-faced writing is not hidden or obscured; in fact, it is free-standing and set forth in its own paragraph out from the remainder of the text. (*Id.*) In addition, below the disclaimer, the Retail Contract provides a definition of implied warranty of merchantability. (*Id.* ("An implied warranty of merchantability generally means that the vehicle is fit for the ordinary purpose for which such vehicles are generally used.").)

The fact that the disclaimer is on the back side of the Retail Contract does not, in this case at least, alter the result of the analysis about whether a reasonable person would be expected to notice it. *Accord, e.g., Soldinger,* 1998 WL 151817 at *4 ("The fact that the disclaimer is on the back side of the bill of sale does not make it invalid."). Like the bill of sale in *Soldinger,* the front side of the Retail Contract directs the reader in bold-face type to the back side of the

11

contract "for other important agreements." (D.E. 59, Ex. B (bolding omitted).) In addition, in at least three other places, the front side of the Retail Contract directs the reader to the back side of the agreement. (*Id.*) The front side of the Retail Contract also states in bold-face type: "Notice to the buyer. 1. Do not sign this agreement before you read it or if it contains any blank spaces. 2. You are entitled to an exact copy of the agreement you sign . . . ." (*Id.* (bolding omitted).) In short, with respect to the language directing the reader to the back side of the Retail Contract, a "reasonable person would have read the back side of the [agreement] and noticed the disclaimer." *Soldinger*, 1998 WL 151817 at *4 (finding disclaimer valid and therefore dismissing breach of implied warranty of merchantability claim).[8]

The Hamiltons argue that, because the front side of the Retail Contract does not specify that warranty information is located on the back side of the contract, the disclaimer is not conspicuous. (D.E. 62 at 3.) The Court respectfully disagrees. Illinois courts have enforced disclaimers on the back side of documents where, as here, language on the front of the document directs the purchaser to the back of the document but does not specify that warranty or disclaimer information is located there. *See, e.g., Carpenter*, 551 N.E.2d at 729 (holding that where a party signs a document stating that they have read the agreement, which contains a disclaimer of implied warranties on the reverse side, the disclaimer is valid because "a reasonable buyer would have seen the certificate indicating he had read the back of the document and, at least looked at

---

[8]     Moreover, although not necessary to the result of the analysis, the Court notes that the contract at issue in this appears to be an oversized document—8.5 inches by perhaps as much as 22 inches—such that a reader would naturally be curious about the document and be inclined to flip it over, even if it did not expressly and repeatedly direct the reader to do so, as this one did.

the back. If such a person had looked at the back he would have seen the disclaimer, which was in bold face.").

The Hamiltons' reliance on *Anderson v. Farmers Hybrid Co., Inc.*, 408 N.E.2d 1194 (Ill. App. Ct. 1980), to avoid the effect of the disclaimer is also off the mark. In *Anderson*, the disclaimer was communicated only after an order had orally been placed. *Id.*, 408 N.E.2d at 1200. Moreover, the disclaimer clause was on the back of an order confirmation slip, the front side of which "gave the appearance of being merely a standard order form without more." *Id.* While there was a reference on the seemingly complete front side to terms and conditions on the back, that reference was "not conspicuous in any manner and, in fact, was in smaller print than [the] other [print] on the front side of the order slip." *Id.* Overall, "the general format and size of the order confirmation slip [4 inches by 7 inches] was of such an appearance that a person might reasonably conclude that there was little to the document, other than the statement of the order and delivery dates." *Id. Anderson* appears to be a case highly dependent on its own peculiar facts; in any event, it cannot fairly be analogized to this case, in which an reasonable person would appreciate that they were signing a standard retail installment contract to purchase an automobile and not merely receiving an order confirmation slip.

Finally, in a last attempt to invalidate the disclaimer, the Hamiltons rely on *Board of Managers v. Wilmette Partners*, 760 N.E.2d 976 (Ill. 2001), and *Petersen v. Hubschman Construction Co., Inc.*, 389 N.E.2d 1154 (Ill. 1979), to argue that O'Connor cannot disclaim the implied warranty of merchantability because the Hamiltons never agreed to the warranty disclaimer. (D.E. 62 at 3.) Neither of these cases apply here. *Board of Managers* and *Petersen* address the requirements for a valid waiver of the implied warranty of habitability, not the

13

implied warranty of merchantability at issue in the case *sub judice*.[9] In any event, it is axiomatic that the Hamiltons' execution of the Retail Contract demonstrates that they agreed to its terms, including the disclaimer clearly set forth in writing in the documents. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome."); *accord, e.g., Paper Express, Ltd. v. Pfankuch Maschinen, GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) ("In fact, a blind or illiterate party (or simply one unfamiliar with the contract language) who signs the contract without learning of its contents would be bound.").[10]

---

[9]     The *Board of Managers* court specifically found that "the implied warranty of habitability is distinct from other warranties by its very nature." *Board of Managers v. Wilmette Partners*, 760 N.E.2d 976, 981 (Ill. 2001)

[10]     In seeking to avoid the disclaimer, the Hamiltons contend that it is "highly suspect" that O'Connor failed to attach the "Used Car Buyers Guide" to its summary judgment papers. (D.E. 62 at 4.) In this regard, the Hamiltons attached a generic, blank "Buyers Guide" form to their response to the Motion. (*Id.* at Ex. A.) The form includes two boxes for a car dealer to indicate whether a vehicle is being sold "As Is - No Warranty" or with a "Warranty." (*Id.*) The Hamiltons' attachment of a blank, generic "Buyers Guide," without more, is insufficient to create a material issue of fact with respect to the Retail Contract; the model form says nothing about the particular transaction at issue here, and the Hamiltons do not offer any testimony concerning their recollections or understandings of any document actually used in this transaction. The Hamiltons failed to produce any evidence that would lead a reasonable fact finder to conclude that the Retail Contract at issue here was modified by a "Used Car Buyers Guide," and their invitation to engage in speculation about a document outside the record (*i.e.*, the actual completed document, as opposed to the generic, blank one) is insufficient to create a material issue of fact. *See Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) ("[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)); *accord, e.g., Anderson v. Stauffer Chemical Co.*, 965 F.2d 397, 402 (7th Cir. 1992) ("[S]peculation is not enough to avoid summary judgment") (citation omitted).

2.    The Service Contract

The Hamiltons contend that, even if the disclaimer of the implied warranty of

merchantability is valid, the disclaimer cannot apply because, under section 2308(a) of

Magnuson-Moss, the disclaimer is invalid. The Court finds that there is a triable issue as to this

contention, although the Court reserves judgment on the question (which was not meaningfully

addressed in the briefs) of the scope of remedy the Hamiltons might obtain on this Count.

Section 2308 of Magnuson-Moss, which modifies section 2301(7) of the Act, provides in

relevant part:

> (a) No supplier may disclaim or modify . . . any implied warranty to a consumer
> . . . if (1) such supplier makes any written warranty to the consumer . . . or (2) at
> the time of sale, or within 90 days thereafter, such supplier enters into a service
> contract with the consumer which applies to such consumer product.
>
> (c) A disclaimer, modification, or limitation made in violation of this section shall be
> ineffective for purposes of this chapter and State law.

15 U.S.C. § 2308(a) and (c).[11]

The Court first will examine whether there is a triable issue as to whether O'Connor

entered into a "service contract." As explained below, there is not.

Much of the debate in this case about the "service contract" issue relates to whether the

Hamiltons entered into such a contract with a third party (*i.e.*, Lyndon American) or with

O'Connor. In *Priebe v. Autobarn, Ltd.*, 240 F.3d 584 (7th Cir. 2001), the Seventh Circuit

recently addressed whether the existence of a service contract with a third party precluded a car

dealer from disclaiming the implied warranty of merchantability under section 2308(a). *Id.* at

---

[11]    The Act defines a service contract as "a contract in writing to perform, over a
fixed period of time or for a specified duration, services relating to the maintenance or repair (or
both) of a consumer product." 15 U.S.C. § 2301(8).

15

588. In *Priebe*, the car dealer disclaimed the implied warranty of merchantability, but told the buyer that the car had been inspected and had not been involved in any prior accidents. *Id.* at 586. Through the car dealer, the buyer bought a service plan administrated by a unaffiliated third party. *Id.* The buyer crashed the car roughly one month later, and then sued the car dealer for, *inter alia*, breach of the warranty of merchantability implied by Illinois law, claiming the car had previous damage which made it dangerous to drive. *Id.* Under these facts, the Seventh Circuit concluded that the "service contract cannot be construed as creating a warranty of merchantability because the service contract bound [the third party], not [the car dealer], to repair the [vehicle]. [The buyer] has not articulated how [the car dealer] is a party to the contract." *Id.* at 588.

Prior to *Priebe*, district courts in this judicial district consistently held that the fact that a car dealer sells a service contract or presents a manufacturer's warranty to a buyer in connection with the purchase of a car does not necessarily imply that the car dealer entered into the service contract or adopted the manufacturer's warranty for purposes of section 2308. *See, e.g., Long*, 2001 U.S. Dist. LEXIS 24135 at *5 (holding that car dealer did not "enter into" a service contract when the dealer sold the buyer a service contract). In *Soldinger*, for example, the court held that the "mere delivery, presentation or explanation of a manufacturer's warranty, without more, does not render a dealer a co-warrantor by adoption." 1998 WL 151817 at *3 (citing *Lytle v. Roto Lincoln Mercury & Subaru, Inc.*, 521 N.E.2d 201, 204-05 (Ill. App. Ct. 1988), which explained that the fact that a car dealer signed a warranty booklet under a line stating "issued by" merely showed that the dealer had presented the manufacturer's warranty to the purchaser, not that the car dealer adopted the warranty); *compare Felde v. Chrysler Credit Corp.*, 580 N.E.2d 191, 196-

16

97 (Ill. App. Ct. 1991) (finding that car dealer adopted written warranties issued by the manufacturer, Chrysler Corporation, because the dealer invoice explicitly incorporated the warranties by stating that no warranties had been made by the dealer or manufacturer "excepting only Chrysler Corporation's current printed warranty applicable to such vehicle . . . which warranty is incorporated herein and made a part hereof and a copy of which will be delivered to buyer at the time of delivery of the new motor vehicle . . . .").

With the foregoing authority in mind, the Court turns to the agreements at issue here. The Retail Contract references the Service Contract only one time, stating—in a blank space labeled "Other Charges" and further stating that O'Connor must identify who will receive payment—that there is an "other charg[e]" to "Lyndon American (See Service Contract)." (D.E. 59, Ex. B.) This language suggests, at most, that O'Connor sold the Service Contract to the Hamiltons, not that it is a party to, or obligated under, the Service Contract. *Accord, e.g., Priebe,* 240 F.3d at 588; *Long,* 2001 U.S. Dist. Lexis at 24135 at *5. Moreover, the fact that the Hamiltons financed the Service Contract with Lyndon American as part of the same overall financing package for the automobile does not make O'Connor a party to the Service Contract, and the Hamiltons have cited no authority supporting that counterintuitive conclusion.

With respect to the Service Contract itself, the agreement provides that the "Administrator," and thus the "Obligor," is Lyndon American. (D.E. 59, Ex. C at 2; *accord id.* ("In the stat[e] of . . . Illinois . . . the OBLIGOR is the ADMINISTRATOR (Lyndon American, Inc.)." (capitalization in original).) The "Our Responsibilities" section of the Service Contract provides that the "Administrator" (Lyndon), is the applicable obligor, and is responsible for reimbursing reasonable expenses incurred for repairs and replacement of covered parts. (*Id.*)

17

The Service Contract states that the buyer should take the vehicle to "Us" (O'Connor) for repairs and/or replacements, but does not obligate O'Connor to perform these services. *Accord Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*, 558 A.2d 1066, 1073 (Del. Supr. Ct 1989) (the dealer's delivery of the manufacturer's warranty to the buyer, which warranty said that "any authorized Mercedes-Benz dealer" would make necessary warranty repairs, was not an undertaking on the part of the dealer to repair the product). In this regard, the "How to Submit Claim" section of the Service Contract specifically provides that, if it is not possible for the buyer to bring the vehicle to "Us" (O'Connor) for servicing, then the buyer can bring the vehicle to any qualified repair facility, and if the buyer does not know of one, the buyer should call the Administrator (Lyndon) to locate one. (D.E. 59, Ex. C at 6.) In short, the Court finds that nothing in the Service Contract or the record obligates O'Connor to repair the Chrysler, or reimburse the Hamiltons with respect to such work, and thus O'Connor did not "enter into" the Service Contract for purposes of section 2308 of Magnuson-Moss. *Accord, e.g., Priebe*, 240 F.3d at 588; *Long*, 2001 U.S. Dist. Lexis at 24135 at *5.[12]

Moreover, the fact that O'Connor received a portion of the monies paid in connection with the Service Contract does not make O'Connor a party to it. Car dealerships are entitled to act as agents in selling service contracts, and the Hamiltons offer no authority for the proposition that the retention of a fee makes O'Connor a party to the contract. As an agent or solicitor,

---

[12]     The Hamiltons allege that O'Connor did not forward certain repair bills to Lyndon for reimbursement. The Hamiltons do not explain how that fact, even if true, makes O'Connor a party to the Service Agreement, which clearly reflects that it is between the Hamiltons and Lyndon.

O'Connor also was able to offer an explanation about the benefits of the Service contract without becoming a party to it.[13]

Plaintiffs' citation of *Rothe v. Maloney Cadillac, Inc.*, 492 N.E.2d 497 (Ill. App. Ct. 1986), *aff'd in part and vacated in part*, 518 N.E.2d 1028 (1988), does not assist their cause. In *Rothe*, the court concluded that the car dealer was an obligor where language in the service contract provided that the car dealer "agree[d] to promptly perform and fulfill all terms and conditions of the owner service policy." *Id.* at 503. Nothing in the Service Contract or Retail Contract suggests that O'Connor is undertaking to fulfill Lyndon's global responsibilities under the Service Contract. *Rothe* therefore is not controlling here. *Accord Lytle*, 521 N.E.2d at 204-05.

Notwithstanding the fact that O'Connor did not enter into the Service Contract, there is a triable issue created as to whether it entered into a "written warranty" through its provision of a "we owe" form to the Hamiltons at the time of the sale. The Magnuson-Moss Act defines "written warranty" to include

> any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

---

[13]     The Hamiltons provide no evidentiary support for their contention that O'Connor "negotiated the terms of the service contract, including the number of months and miles of coverage, and the price of the service contract." (D.E. 63 at 3, ¶ 9.) In any event, negotiating price terms or contract length does not make an entity a party to the contract; otherwise, most agents and attorneys would become parties to all sorts of contracts (*e.g.*, personal services contracts, corporate merger agreements, etc.), which is clearly not the case.

15 U.S.C. § 2301(6)(B). If a supplier makes a written warranty to a consumer in connection with a sale, that limits the supplier's ability to disclaim the implied warranty of merchantability. *See* 15 U.S.C. § 2308(a).

As the Hamiltons note, at the time of the sale, O'Connor provided them a written "we owe" slip (D.E. 59, Ex. D), by which O'Connor promised to "check & repair brakes" and provided that the Hamiltons had 30 days by which to address the brake issue or O'Connor's obligation would lapse. (*Id.*) A jury reasonably could conclude that this document constituted an "understanding in writing in connection with the sale" of the car, to "repair, replace, or take other remedial action with respect to" the car, and which "written affirmation, promise or undertaking becomes part of the basis of the bargain." 15 U.S.C. § 2301(6)(B). Accordingly, there is at least one material unresolved issue, and summary judgment in favor of O'Connor is not warranted.

3. Damages/Breach Analysis

O'Connor argues that even if the disclaimer of the implied warranty of merchantability was not valid, the Hamiltons have failed to offer any evidence that the alleged defects and mechanical problems in the vehicle existed at the time of sale. *See* 10 ILCS 5/2-725 (the cause of action for breach of an implied warranty accrues when tender of delivery was made); *see also Lipinski v. Martin J. Kelly Oldsmobile, Inc.*, 759 N.E.2d 66, 75 (Il. App. Ct. 2001) ("An implied warranty of merchantability applies to the condition of the goods at the time of sale and is breached only if the defect in the goods existed when the goods left the seller's control.").

On the basis of the evidence presented, the Court cannot conclude, as a matter of law, that the Defendant has rebutted all reasonable chance that the alleged defects existed at the time of the sale. There are claims, at least, of a meaningful number of problems with the car within the

20

first sixty days after delivery; these alleged defects include a rusted-out tie rod and a leaking intake gasket that both needed to be replaced. (D.E. 62 at 7.) A jury might fairly conclude (at least on the basis of the evidence in the record so far) that at least some of the alleged defects existed at the time of sale.

To be sure, Defendant offers evidence that, if credited, casts substantial doubt on the veracity of some, and perhaps many or all, of the damage allegations. However, there are at least some triable damages questions (e.g., the tie rod, valve, and likely some brake pad questions) for the jury to resolve.

The Court notes, however, that it reserves judgment on a question suggested by the briefs and the cited authorities but not meaningfully explored by the parties—namely, whether any promises by O'Connor as to repairing the vehicle's brakes limits the Hamilton's ability to recover under the Magnuson-Moss claim for any defects unrelated to brakes issues. For example, one of the Hamiltons' cited authorities, *Heat Exchangers, Inc. v. Aaron Friedman, Inc.*, 421 N.E.2d 336 (Ill. App. Ct. 1981), appears to teach that where a warranty is limited in scope or as to relief, those limits should be respected unless the remedy failed in its "essential purpose." *Id.* at 343. The parties have not meaningfully briefed this question, and the issue of scope of available remedy will need to be addressed by the parties in their preparation of jury instructions.

For all of these reasons, the Court denies summary judgment with respect to Count V.

B.      Section 2C Illinois Consumer Fraud Act Claim (Count VII)

Section 2C of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") provides, in relevant part

21

> If the furnishing of merchandise is conditioned on the consumer's providing credit references or having a credit rating acceptable to the seller and the seller rejects the credit application of . . . [a] consumer, the seller must return to the consumer any down payment, whether such down payment is in the form of money, goods, chattels or otherwise, made under the purchase order or contract and may not retain any part thereof. The retention by the seller of part or all of the down payment . . . under those circumstances as a fee for investigating the credit of the consumer or as liquidated damages to cover depreciation of the merchandise which was the subject of the purchase order or contract or for any other purpose is an unlawful practice within the meaning of this Act, whether that fee or those charges are claimed from the down payment, whether such down payment is in the form of money, goods, chattels or otherwise, or made as a separate charge to the consumer.

815 ILCS 505/2C ("Section 2C"). The Hamiltons claim that their credit application was rejected when O'Connor asked them to come in and execute the new Retail Contract with a higher interest rate, and therefore O'Connor violated Section 2C in failing to return the $2,000 down payment at that time. (D.E. 62 at 10-12.) O'Connor contends that neither a change in financing terms, nor a failure to grant credit on specific terms, constitutes rejection of a credit application for purposes of Section 2C. O'Connor further contends that the statute does not require the return of a consumer's down payment where, as here, the consumer retained possession of the vehicle until the car was repossessed. (D.E. 58 at 9-13.)

The Court first addresses whether O'Connor rejected the Hamiltons' credit application within the meaning of Section 2C. Illinois courts have found that a change in credit terms, or a refusal to grant credit on particular terms, constitutes rejection of a credit application for purposes of Section 2C. For example, in *Bates v. William Chevrolet/GEO, Inc.*, 785 N.E.2d 53 (Ill. App. Ct. 2003), the court found that a car dealer's failure to procure financing for a potential buyer at the requested rate of $350 per month, based on testimony that the buyer told the dealer that she did not want monthly payments to exceed this amount, constituted rejection of a credit

application for purposes of Section 2C. *See id.*, 785 N.E.2d at 61. Likewise, in *Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.*, 600 N.E.2d 1218 (Ill. App. Ct. 1992), the buyer gave her used car as a down payment on a new car, and signed a contract for a new car, which provided that the buyer had seven days to procure her own financing. *Id.*, 600 N.E.2d at 1220. When the buyer returned to the dealer unable to obtain her own financing, the dealer told her that the price of the car increased by $1,000 and, if she could not pay the additional amount, she would have to buy a cheaper car. *Id.* The buyer refused to pay the increased price and returned the new car to the dealer, but the dealer refused to return the used car to the buyer. *Id.* Under these facts, the *Roche* court found that the dealer rejected the buyer's credit the moment it asked the buyer to pay an additional $1,000, and thus the dealer was required to return the down payment at that time. *Id.* at 1226. Thus, in this case, where the Hamiltons at least allegedly were asked to undertake credit obligations at a rate higher than originally represented, there was a rejection within the meaning of Section 2C.

The Court also respectfully rejects O'Connor's contention that the undisputed facts establish that there could be no violation of Section 2C or duty to return any downpayment because the Hamiltons never were willing to return the car. *See* D.E. 65 at 12 ("[N]o Illinois court has ever found a dealer liable under Section 2C for failing to return a down payment where . . . the purchaser retained possession of the vehicle"). In fact, Ms. Hamilton expressly testified in an affidavit that she was willing and would have returned the car, but that O'Connor represented that she could not get the down payment back and that she had no choice but to sign a new contract. (D.E. 63, Ex. 2, ¶ 5; D.E 64 at 8, ¶ 27.)

23

Moreover, the Court does not credit O'Connor's contention that the Hamiltons could never show actual damages—a prerequisite to maintaining a private claim under the Illinois Consumer Fraud Act. O'Connor suggests that the Hamiltons' claimed damages fail to account for the fact that the Plaintiffs "retained possession and use of the vehicle" until it was repossessed. (D.E. 58 at 12.) However, as previously mentioned, the Hamiltons' theory is that they were misled into believing that they could not return the car, and that if they knew the truth, the would have returned the vehicle and gotten their down payment back. O'Connor vigorously disputes the Plaintiffs' version of the events and their claim that they were misled, but, if the jury were to credit the Hamiltons' account, O'Connor's argument about the negation of any actual damages would not be a winning argument, even on its own terms.

Accordingly, it is at least possible that the Hamiltons could advance a winning claim. The motion for summary judgment with respect to Count VII is therefore denied.

C.    Illinois Consumer Fraud Act Claim Based on Misrepresentations and Omissions (Count VIII)

The Hamiltons allege that O'Connor made various misrepresentations about the Chrysler in violation of Section 505/2 of the Illinois Consumer Act.[14] More specifically, the Hamiltons allege that the Chrysler: had a Blue Book value of $25,000 (D.E. 64 ¶ 20), was a certified pre-

---

[14]    The Illinois Consumer Fraud Act provides, in relevant part, that

unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful . . ..

815 ILCS 505/2.

24

owned vehicle that had passed a rigid inspection test (D.E. 59, Ex. A at 15), was privately owned (*id.*), and was free from mechanical defects (*id.* at 18-19). In the Motion, O'Connor claims it is entitled to summary judgment with respect to Count VIII because, assuming these statements were actually made, they are accurate and thus there can be no violation of section 505/2 based on misrepresentation. The Court respectfully disagrees, at least as to some of the comments, and rejects the motion to dismiss Count VIII.

Count VIII would not properly be subject to dismissal for the simple fact that if the Hamiltons were told that the Blue Book value of the vehicle was $25,000, and the value actually was a lower number, the Count would need to be presented to the jury. (The dealership denies that any such false representation actually was uttered. (See D.E. 64 ¶ 20.).)

Moreover, although Defendant contends that it irrefutably rebutted the Hamiltons' fraud contention concerning the nature of the inspection for the car, the Defendant merely averred that: "Prior to O'Connor Chevrolet putting any used automobile for sales [sic] at its location, a rigid inspection test is performed, and the vehicle is reconditioned to the highest standards . . . " (D.E. 59, Ex. E ¶ 13.) That barebones assertion is too conclusory to conclude that a jury could not fairly find in favor of the Hamiltons after a cross-examination of the declarant and an unpacking of the statement and an exploration of related facts and circumstances.

The Court reaches the same result with respect to alleged representations about whether the car was free of any mechanical defects at the time of the sale. The nature of at least some of the alleged defects (for example, a rusted-through tie rod) are such that a reasonable jury might conclude (again, the facts are disputed) that the vehicle was not in entirely sound condition when it left the lot. As Defendant argues at some length, it will have its own case for the jury—likely

25

based on evidence in the form of odometer readings that suggest that Mr. Hamilton was driving the car extensively in the months after the sale, such that one might question his sweeping claims of problems and/or whether any problems were caused by extensive use. Nonetheless, these sorts of issues are best addressed by the jury, not through summary judgment.

Not all of the Hamilton's allegations of fraud, however, are triable ones. Plaintiffs note that Ms. Hamilton alleges that she was told that the car was "privately owned." Ms. Hamilton alleges that this statement was fraudulent because she understood it to mean that it had only "one owner" previously. (D.E. 59 at 9, ¶¶ 30-31.) The term "privately owned" might reasonably be understood to mean multiple things. The most natural meaning is that the car was not owned by a public entity such as a police force or post department office. Alternatively, the phrase perhaps might mean that the car was not owned by a company or business, although one might argue that such an interpretation would be an unwarranted stretch. In any event, the phrase "privately owned" cannot reasonably be asserted to mean "owned by a single prior owner." Plaintiffs have failed to show that a jury could reasonably find fraud from this statement as to the fact that the car may have had more than one prior owner. *See, e.g., Liberty Lobby, Inc.*, 477 U.S. 251-52; *McDonald v. Village of Winnetka*, 371 F.3d 992, 1002 (7th Cir. 2004). This aspect of the fraud count should not go to the jury.

For the reasons stated above, the Court denies summary judgment with respect to Count VIII in part and grants it in part.

IV.    Conclusion

For all of these reasons, the Court denies the motion with respect to Counts V and VII.

The Court grants the Motion in part and denies the Motion in part with respect to Count VIII.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date November 16, 2005

27